### SELLERS et al. v. BELL.

(Circuit Court of Appeals, Fifth Circuit. May 31, 1899.)

#### No. 818.

1. **BANKRUPTCY—DISCHARGE—KEEPING BOOKS OF ACCOUNT.**
   The bankrupt's omission to keep books of account cannot be made a ground of opposition to his discharge, when it appears that, since a time more than three years prior to the passage of the bankruptcy act, he has not been engaged in any business to which the keeping of books would be necessary or appropriate.

2. **SAME—SCHEDULES—JUDGMENT—DEBT.**
   Where a judgment previously recovered against the bankrupt still appears on the records of the court, which rendered it as an unsatisfied obligation against him in favor of the judgment creditor, it is rightly included in the bankrupt's schedule as a debt due to that creditor, although it has actually been sold to another creditor, and the bankrupt is chargeable with knowledge of the sale.

3. **SAME—MONEY BORROWED FOR ATTORNEY'S FEE.**
   Where a proposed voluntary bankrupt, who has no property except such as is exempt, borrows $50, wherewith to pay the fees and costs of his attorney, just before filing his petition, he is not required to list the amount so borrowed in his schedule of assets, and his omission to do so is no ground of opposition to his discharge.

4. **SAME—EXEMPT PROPERTY—WEARING APPAREL.**
   Under Code Ala. § 2037, exempting from execution personal property to the amount of $1,000, and, in addition thereto, "all necessary and proper wearing apparel," a watch may be included in the term "wearing apparel"; and consequently, where the schedule of a voluntary bankrupt disclosed no assets except as appeared in the item "personal wearing apparel, $100,"

94 F.—51

which he claimed as exempt, he is not guilty of making a false oath to such schedule, so as to bar his discharge, although it is shown that he owned a gold watch worth $50, which he habitually wore, and which he intended to include in the item mentioned.

5. SAME—CLAIM AGAINST BANKRUPT'S WIFE.

Where a husband, being at the time in business and enjoying good credit, advanced to his wife a sum of money to enable her to complete a purchase of realty for her own benefit, but took no note for the amount, and made no entry or memorandum of the loan, and never asked for repayment, and, being subsequently adjudged bankrupt, testified that his wife owed him the money, but that he did not exact it of her, *held*, that his omission to include this claim in his schedule of property would not bar his right to a discharge in bankruptcy, especially as the money, if repaid, would be claimable by the bankrupt as part of his statutory exemption, except as against a single creditor holding a note with waiver of exemption.

6. SAME—FILING FEES—POVERTY AFFIDAVIT.

A voluntary bankrupt, whose petition is accompanied by an affidavit that he is without and cannot obtain the money necessary to pay the filing fees, cannot subsequently be required to pay such fees out of any property set apart to him as exempt, or out of money earned by him after the filing of the petition.

7. SAME.

A proposed voluntary bankrupt, who has not money enough to pay the filing fees, is not required to solicit gifts or loans from his friends for that purpose; and he is not guilty of a false oath in making affidavit that he "cannot obtain" the requisite sum, although it appears that friends would have advanced him the amount if requested.

Appeal from the District Court of the United States for the Middle District of Alabama.

Willis V. Bell, the appellee, resides in Montgomery county, Ala. Having caused to be prepared a petition to the court of bankruptcy praying for the benefit of the bankrupt act, to be adjudged a voluntary bankrupt, and to have a discharge from all his debts provable under the act, on September 8th he made affidavit before a notary public to this petition and to Schedules A and B attached thereto, and to a statement in writing "that he is a poor man; that he is not possessed of sufficient means and is not actually able to pay the deposit of twenty-five ($25) dollars for court costs in the above-entitled cause." On the same day these papers were submitted to the clerk of the court of bankruptcy by the appellee's attorneys, Reese & Sternfeld. The clerk declined to receive and file them, because the affidavit did not state that he could not obtain the money. On being advised of this (at his home), he went to Montgomery, and, with his consent, there was added, to the affidavit that he had made of inability to pay costs, the words, "And that he cannot obtain the money with which to pay said fees." Thereupon, on September 12th, the clerk filed the papers, and the cause duly proceeded. Schedule A showed the names of 21 creditors whose claims were in judgment, aggregating in amount $41,341.42, and 15 creditors who had not sued their claims to judgment, whose claims aggregated in amount $4,435.31. Schedule B, omitting the signature and affidavit thereto, was as follows:

### "Schedule B.

"Statement of all real and personal estate and effects whatever of Willis V. Bell, with his claim of exemptions of personal property and effects excepted from the operation of said act by the provisions of section —— thereof: Real estate, none; personal wearing apparel, $100,—which said personal property is claimed as exempt from levy and sale under execution or other process for the collection of debts, under section 2037 of Code of Alabama 1896, and which is excepted from the operation of the act of July 1, 1898, by the provisions of section —— thereof."

On the same day that these papers were filed the petitioner was adjudged to be a voluntary bankrupt.

At the first meeting of creditors, held October 5th, the appellants appeared before the referee by counsel. Only the appellants had then or have ever proved their debts against this bankrupt, and hence they alone, of the numerous creditors, appeared at that meeting or at any subsequent stage of these proceedings in bankruptcy. On October 5th the appellee also appeared before the referee, and was cross-examined by counsel for the appellants. The referee's report of that examination is as follows: "At Montgomery, October 5, 1898. Willis V. Bell, the bankrupt, being duly sworn, deposes and says: I stay at Ada. My wife and children are living at Ada. I am 46 years old. I am superintending a farm for N. J. Bell and a commissary store for him. We have never had a definite understanding about salary. I was to have a living. That understanding has been in vogue since December, 1894. Contract verbal, and not in writing. We have had no settlement. N. J. Bell looks over his books about twice a year. This understanding includes a living for my family as well as myself. Nothing said about spending money. I get money, besides my living and clothes, to pay tuition for the children and the doctor's bill. I have a pass on the Midland Railroad, and don't pay fare. I go to see my father once a year, and pay my fare on the Louisville & Nashville Railroad. My wife has some money, and I get it from her every time I want it, if she has it. I cannot tell always where I get the money from. Sometimes I sell an old suit of clothes, and get four or five dollars. My wife has some money,—a steady income. It don't amount to much this year. The rents amount to about 24 bales for the year. She had some of the property when we married, —about $400 or $500. She got a place that she bought in 1891. I think she paid about $1,400 for it. I believe that was all she had. She had got one place she bought since then for $2,000, paying $1,000 cash and $1,000 on time, secured by a mortgage which is now held by my brother N. J. Bell. She has two or three little places. She has 80 acres of land she paid $100 for, and another 80 she paid $300 for. She owns the following named places: The Webster place, that she paid $1,400 for; the place called the Woodson place, for which she paid $100; then she has another tract called the Giddins place. I think she paid $300 for that. She has the Moseley place, for which she paid $2,000, as stated above. She derives all her income from these places, except some houses and lots in Ramer and 40 acres of land near Ramer. She had a storehouse there, but I moved it away. She has three dwelling houses and lots there. I reckon they are worth about $300 apiece. The store lot is worth about $50. Two of them are not rented now. Two of them, when last rented, rented for $4. The other rented for $5 a month. One was rented up to August last. The other rented a while last spring. We got $50 a year for the 40 acres of land near Ramer up to this year. This year we got $40. I married in 1890. My wife has one place—the Webster place—that she has been getting $250 to $350 a year for. She accumulated the money, and I kept it for her mostly. We usually kept it about the house, sometimes in the wardrobe. She bought the Webster place in the summer of 1891. We did not get the rent that year. I bought it from —— Webster, who lives at La Pine. I paid $1,400 for it,—$500 cash and the balance in the fall. My wife had $500 or $600, and I let her have some in the fall of 1890 or 1891,—at the time the purchase was made,—and some when the final payment was made. To the best of my recollection I let her have as much as $500 at the time the last payment was made. She had the lots at Ramer when we were married. My wife bought the $2,000 plantation about two years ago, since I failed. We bought from a man named Laird, of Colburg. My wife had the money. She got it from rents of her places. She has never paid me back the money I loaned her. I never loaned her any other money. I took no note for the money I loaned her, and made no entry on any book, and made no other memorandum of it, and I do not keep any books between my wife and myself. I never asked her to pay it back to me. You might say that she owes it. She really owes it; but I do not exact it of her. The arrangement I have with N. J. Bell includes my living and living for my family, and amounts to between $600 and $800. My brother limits me to an expense account of not over $800. I get a little money on that account, and charge it to myself. The largest amount I recollect getting under this arrangement from the store was $75 or $100,—not over $100. I have been in the mercantile and farming business

a long time. I failed and went out of business in 1894. The arrangement went into effect in January, 1895, and has been in effect ever since. When I failed, N. J. Bell took all the property on hand at that time, and none of my other creditors got anything. I put down in my schedule personal wearing apparel at $100, comprising all my estate. I have a gold watch worth $50, and had it at the time I made out the schedule. I had no other property. The most of my accounts on hand when I failed were secured by mortgage, and have been transferred to N. J. Bell. I know there are some accounts on my old books due and uncollected. They are all out of date and barred by statute of limitations. Q. You have stated these accounts are barred by statutes of limitations; do you know how long it takes for the statute of limitations to bar an account? A. I think it takes three years to bar an account stated. Q. How long does it take to bar an open account? A. About two years I think. I have kept no books since I suspended business in the fall of 1894. I had a diamond stud which could be worn as a ring. I gave it to my wife when we were married. I gave $150 for it. I made the affidavit of inability to pay court fees [shown here, the same being the one now on file]. I think the affidavit was as it now is when I swore to it. There was some change made in the affidavit as originally prepared; but the changes were made with my knowledge, approval, and assent, and the affidavit, as it now stands, was sworn to by me. The only man I talked to about getting the money to pay for this bankruptcy proceeding was my brother, N. J. Bell, and he asked me, 'What's it going to cost?' I told him I did not know, but would see a lawyer and find out. He told me, if it cost over $50 or $75, he advised me not to have anything to do with it. After I filed the pauper's oath, Mr. Bernard Frank came to me and said it was too bad; that he and several of my friends would have let me have money, if I had come to them. I did not say anything to N. J. Bell about letting me have this $25 deposit fee after I had decided to go into bankruptcy. I did not ask my wife to let me have the $25 to make this deposit fee. I never asked anybody to let me have it. I borrowed from Freeman Rushton fifty dollars just before I made the affidavit of inability to pay court costs, and had $35 of it at the time I first made the oath. Between that time and the time the oath was changed I paid my attorneys $25, and I think I paid to my attorneys the other $10 for advertising or costs, or something of that kind. The balance of the fifty dollars, to wit, fifteen dollars, I might have bought goods for myself and family with. Still have two or three dollars at this time. [Signed]  W. V. Bell."

On February 7, 1899, the bankrupt presented his petition for discharge, which is as follows: "W. V. Bell, of Ada, in the county of Montgomery and state of Alabama, in said district, respectfully represents that on the 12th day of September last past he was duly adjudged bankrupt under the acts of congress relating to bankruptcy; that he has duly surrendered all his property and rights of property, and has fully complied with all the requirements of said acts and orders of the court touching his bankruptcy. Wherefore he prays that he may be decreed by the court to have a full discharge from all debts provable against his estate under said bankrupt acts, except such debts as are excepted by law from such discharge."

On February 15th the judge of the court of bankruptcy made the following order: "For good and sufficient reasons shown, it is ordered that the affidavit of inability to pay filing fees of the petitioner filed herein, with the petition herein, be stricken from the file in this case, and that the petitioner be, and he is hereby, permitted to withdraw said affidavit."

On the 18th the appellants Sellers & Orum filed the following: "Sellers & Orum, of Montgomery, in the county of Montgomery and state of Alabama, parties interested in the estate of said W. V. Bell, bankrupt, do hereby oppose the granting to him of a discharge from his debts, and for the grounds of such opposition do file the following specifications: (1) That said W. V. Bell did knowingly, willfully, and fraudulently not attach a full, true, and correct schedule of all his property to his petition to be adjudged a bankrupt. (2) That the schedule of his property which W. V. Bell attached to his petition to be adjudged a bankrupt is willfully and knowingly false and untrue, in that it does not contain a debt of about $600 which was due from the said Bell's wife to him. (3) That said schedule of his property attached by said Bell to his peti-

tion is willfully and knowingly false and untrue, in that the said Bell does not include in said schedule a gold watch worth about $50, which his testimony shows he owned at the time said petition was filed. (4) That said schedule of his property attached by said Bell to his petition is willfully and knowingly false and untrue, in that said Bell had at the time of filing said petition a sum of money, to wit, $50 or other sum, as shown by his testimony on his examination, which said Bell has never turned over to the trustee in this proceeding. (5) That said W. V. Bell willfully and knowingly swore falsely when he made the pauper's oath to the petition, swearing that he did not have, and could not obtain, money to deposit as costs and fees. (6) That the said W. V. Bell willfully and knowingly swore falsely when he made the pauper's oath to the petition, swearing that he did not have, and could not obtain, money to deposit as costs and fees, in that he had $50 or other large sum when he made said affidavit. (7) Because said Bell willfully and fraudulently has not turned over any property to the trustee in this proceeding. (8) That the said Bell willfully and knowingly negligently failed to keep, for several years prior to filing said petition, any books of account or other books showing his assets and liabilities, so that the same might be ascertained in this bankruptcy proceeding. (9) That the laws of Alabama do not allow the said W. V. Bell any exemptions of personal property against the debt of this creditor, and that the said Bell has willfully and knowingly failed to turn over to the trustee the property set out in the schedule attached to his petition in this cause or the other property he owned, as shown by his own testimony in this case. (10) These creditors are informed and believe, and upon such information and belief state, that the list of creditors filed by said Bell is willfully and knowingly incorrect and false in this: that D. M. Snow & Co. appears as a creditor for the sum of eleven hundred one and 96/100 dollars, when, at the time said petition was filed, said D. M. Snow & Co. was not a creditor of said Bell. (11) These creditors are informed and believe, and upon such information and belief state, that the said Bell paid D. M. Snow & Co. in full, or compromised their claim and settled it in full, before he filed his petition in this cause, and that D. M. Snow & Co. were not creditors. and the list of creditors returned by said Bell with his petition is willfully and knowingly untrue and incorrect."

After the filing of the foregoing, Sellers & Orum added to the specification of the grounds of their objection to the discharge that "the said Bell, before he filed his petition in bankruptcy in this court, and in contemplation of the filing of said petition, offered to petitioners (creditors), and stated to them, that he intended to file his petition in bankruptcy, but that he intended to pay them what he had paid other creditors, notwithstanding he got discharged from their debts." At the same time and by the same counsel the appellants W. B. Jones and Ray filed identically the same objections, except specification 9, not applicable to their case, as their judgment was not on a waive obligation.

At the instance of the appellants, a second examination of the bankrupt and an examination of other witnesses was had by and before the referee on the 1st and 2d days of March. From the report of that examination we make these excerpts: "Q. (by the appellants' counsel). I believe that you testified on your former examination that you had $50 in your pocket. A. No, sir; I do not think I did. Q. Well, how much did you have on your person? A. I do not know how much I had at the time when the change was made in the paper. I did not have $50. I might have had two or three dollars. I do not remember. Q. Did you have $25? A. I did not have $25. Q. When you first submitted the affidavit to the clerk, did you have any money in your pocket? A. I think I just had a little change. Q. When you submitted the affidavit to the clerk the second time, did you have any money in your pocket? A. I do not think I had." From the testimony of John A. Sellers: "Mr. Bell never offered me at any time anything not to oppose his discharge." From the testimony of W. B. Jones: "I have had no conversation with W. V. Bell since he went into bankruptcy. He never made me any offer, or offered me any inducement not to oppose his discharge." From the testimony of the clerk, questioned by the attorney for the appellee: "Q. Did any one pay the fees, what is known as the primary or original cost fees, for filing the petition in bankruptcy in the matter of W. V. Bell? A. I think, Mr. Wilkinson, you paid the fees yourself. Q. How was it done, by check or in money? A. My recol-

lection is that it was done by giving your check. Q. Was Mr. Reese **or Mr.** Sternfeld present when that was done? A. No, sir. Q. Did they have anything to do with it, or have any knowledge of it? A. I do not know anything about their knowledge. They certainly were not present. Q. Was W. V. Bell present? A. No, sir; he was not. Q. Was it done with his knowledge, so far as you know? A. I cannot say. I suppose it was done by you as his attorney. I suppose you were acting for him. He was not present. Q. You know nothing, then, except the mere fact that one Charles Wilkinson paid the fees of $25? A. Yes, sir; that is all I know about it. Q. Was there what is known as the 'inability oath' made in this case? A. There was. Q. Do you know, as a matter of information connected with your office, that the judge of this district, as well as judges in other districts, have stated judicially that they would refuse to allow a discharge in bankruptcy to a man who has taken that oath? A. I do not understand clearly about this proposition. I have not looked into the question very closely. Once I heard some discussion about the question in a vague, hazy way. We have discharged one man who made that oath without paying his fees."

On March 25th the court of bankruptcy rendered the following judgment: "Whereas, Willis V. Bell has been duly adjudged bankrupt under the act of congress establishing a uniform system of bankruptcy throughout the United States, and appears to have conformed to all the requirements of law in that behalf, it is therefore ordered by the court that said Willis V. Bell be forever discharged from all debts and claims which by said act are made provable against his estate, and which existed on the 12th day of September, 1898, on which day the petition for adjudication was filed by him, excepting such debts, if any, as are by said act excepted from the operation of a discharge in bankruptcy."

The creditors appealed, and present the following assignment of errors: "(1) That the court erred in rendering a judgment granting a discharge to said Willis V. Bell from all debts and claims which were provable against his estate, and which existed on the 12th day of September, 1898. excepting such debts as are by the act of bankruptcy excepted from the operation of a discharge in bankruptcy. (2) That the court erred in not sustaining the objections filed to the discharge of the said Willis V. Bell, as shown by the record. (3) That the court erred in refusing to grant said Willis V. Bell a discharge in bankruptcy from his debts provable under the act of congress approved July 1, 1898, entitled 'An act to establish a uniform system of bankruptcy throughout the United States.' (4) That the court erred as shown by the record."

John D. Roquemore and Robert L. Harmon, for appellant.

Charles Wilkinson, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is to be observed that the petition in this case was presented before the general orders and forms in bankruptcy were prescribed by the supreme court. The general orders were adopted and established November 28, 1898, to take effect January 2, 1899. The forms in bankruptcy were not promulgated until December —, 1898. The attorneys who prepared the petition and schedules and their verification in this case had to use such forms as seemed to them to fit the provisions of the statute and the conditions of the estate. It is made the duty of referees to examine all schedules of property and lists of creditors filed by bankrupts, and to cause such as are incomplete or defective to be amended. Bankruptcy Act, § 39 (2). In this case the honorable referee has not on his own motion caused to be amended the schedules attached to the appellee's petition. The appellants, who were the only creditors that have appeared before the referee to

prove up their claims, have taken no action nor made any direct motion before the referee to have these schedules amended. On the day fixed by the referee for the first meeting of creditors, the appellee promptly appeared and submitted himself "to an examination concerning the conduct of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate," so far as the referee or the counsel for the creditors who were present deemed necessary then to make inquiry. Five months thereafter, at the instance of the same creditors, he again appeared before the referee and submitted to such further examination as the counsel for the creditors chose to make. In the report made by the referee of the appellee's depositions on these two several occasions, there is nothing tending to show that he refused to answer or hesitated in answering any question propounded to him by the referee or by the counsel for the creditors. There is nothing in his testimony or in that of the other witnesses who deposed on the second occasion to show or indicate in the slightest degree that he did not answer fully and truly every question that was propounded to him. It is the duty of the judge of the court of bankruptcy to hear the application for a discharge and such proofs and pleas as may be made in opposition thereto by parties in interest, and investigate the merits of the application and discharge the applicant, "unless he has (1) committed an offense punishable by imprisonment as herein prescribed; or (2) with fraudulent intent to conceal his true financial condition, and in contemplation of bankruptcy, destroyed, concealed, or failed to keep books of account or records from which his true condition might be ascertained." Section 14b. The second of these statutory grounds for refusing to grant the discharge is not applicable to this case, because all the proof shows that the appellee has not, since the passage of the act of bankruptcy, nor within more than three years before the passage of the act, been engaged in business on his own account that required or made it appropriate for him "to keep books of account or records from which his true condition might be ascertained." As provided in the act of bankruptcy, the offenses punishable by imprisonment which the bankrupt may commit are:

"Having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge from his trustee, any of the property belonging to his estate in bankruptcy; or (2) made a false oath or account in, or in relation to, any proceeding in bankruptcy; (3) presented under oath any false claim for proof against the estate of the bankrupt or used any such claim in composition personally or by agent, proxy, or attorney, or as agent, proxy, or attorney." Section 29b.

The appellee in this case has not presented under oath or otherwise any claim, true or false, for proof against his estate. Hence this third subdivision under which a bankrupt may commit an offense, because he is allowed to bring certain claims against the bankrupt estate, cannot be applied here.

The first, third, and fourth errors assigned are too general to require or permit any special consideration of them. We therefore confine our attention to the second, which is:

"That the court erred in not sustaining the objections filed to the discharge of said Willis V. Bell, as shown by the record."

The character of these objections is such that it is more convenient to take them up without regard to the order in which they stand as they were presented.    The last (which was filed subsequently to the others, and on what date it does not appear) we think is fully disposed of by a sentence or two in the testimony given before the referee by the appellants Sellers and Jones.    Sellars says:

"Mr. Bell never offered me at any time anything not to oppose his discharge." Jones says:  "I have had no conversation with W. V. Bell since he went into bankruptcy.    He never made me any offer or offered any inducement not to oppose his discharge in bankruptcy."

The eleventh objection is not only not proved, but is clearly disproved by all the testimony in the case.    It is to the effect that Bell had paid D. M. Snow & Co. in full, or compromised that claim and settled it in full before he filed his petition in this case.    This is not only not sustained by the evidence, but is clearly disproved.    The remaining part of this objection, as stated, is embraced in objection 10, which is to the effect that the firm of D. M. Snow & Co., which firm appears in Schedule A as a creditor, was not a creditor at the time the petition to be declared a bankrupt was filed.    The proof on this subject abundantly shows, and the fact is not disputed by the appellants, that at the time of the failure of the appellee in business the firm of D. M. Snow & Co. was a creditor of his, and sued its debt against him to judgment, and it now appears (like the 20 others shown in the schedule) in the record books of the court rendering the judgment.    The proof indicates that the part of Schedule A which gives the list of the judgment creditors was prepared from data obtained in the court house.    It appears that the books and records of the courts were, and for some years had been, those from which this bankrupt's true condition might best be ascertained.    It does appear from the testimony that, at some time subsequent to the rendition of this judgment, another one of the creditors of the bankrupt (his chief creditor) had purchased (not on the bankrupt's account) this judgment of D. M. Snow & Co.    It further appears that the bankrupt had such information with regard to this purchase as gave him every reason to believe—in popular language, to know—that the purchase had been made.    He had legal personal knowledge of the fact that that firm had extended credit to him, that he had not paid them, and that they had recovered judgment against him.    His Schedule A showed that the residence of this firm was Montgomery, Ala.,— the place where the appellant firm resides and does business.    The referee rightly refrained from causing to be made any amendment of the schedules to meet the suggestions of the proof on which this objection is based, and the judge of the court of bankruptcy did not err in refusing to sustain it.

The ninth objection had better be considered in connection with the first seven.

The eighth has been sufficiently noticed in what was said earlier in this opinion, showing that the second statutory ground for refusing a discharge in bankruptcy has no application to this case.

The other objections, redacted and put in different order and in working form, are: (1) That the bankrupt did not include in the schedule of his property the sum of $50 which he borrowed from Freeman Rushton; (2) that the schedule did not make particular mention of a gold watch which he owned at the time his petition was filed; (3) that he did not include in the schedule of his property a debt of about $600 which his wife owed him; (4) that when he made the affidavit stating that he "is without, and cannot obtain, the money with which to pay" the filing fees he made a false oath in relation to this proceeding in bankruptcy.

We appreciate the gracious forbearance which constrained the appellants to resist the temptation to accompany the first of the objections just above noted with the equally patent, and not less valid, one, "that the list of creditors filed by said Bell is willfully and knowingly incorrect and false in this: that it does not include the name of Freeman Rushton, of Montgomery, Alabama, from whom the said Bell borrowed $50, just before presenting his petition, to be adjudged a voluntary bankrupt." It taxes judicial gravity to consider seriously this objection. The bankrupt law provides that the court shall order the trustee to pay all taxes, national, state, and municipal. These charges occupy a position above classification. It is provided:

"The debts to have priority except as herein, provided, and to be paid in full out of bankrupt's estate, and the order of payment shall be (1) actual and necessary cost of preserving the estate subsequent to the filing of the petition; (2) the filing fees paid by creditors in involuntary cases; (3) the cost of administration, including * * * one reasonable attorney's fee, for the professional services actually rendered * * * to the bankrupt in voluntary cases, as the court may allow."

It is to be observed that in ordinary cases, whether in involuntary or in voluntary bankruptcy, the actual and necessary cost of preserving the estate subsequent to the filing of the petition and up to the qualification of the trustee will usually, and always should where he is exercising good faith, devolve upon the bankrupt himself, not at his charge and expense, but as a charge of the first rank against the estate which he is required or has volunteered to surrender. The charge of the second rank is the filing fees paid by creditors in involuntary cases. The reason for restricting this to fees paid by creditors in involuntary cases is obvious, because where such fees are paid in voluntary cases they may be paid by the bankrupt himself out of the estate which he has to surrender, and therefore no account need be taken of them. The charge next in rank and to be paid in full out of the bankrupt estate is the cost of administration, including a reasonable attorney's fee, such as the court may allow for services actually rendered to the bankrupt in voluntary cases. This clearly shows that, where there is no surrenderable estate in the bankrupt's hands out of which he could pay either in money or in property a reasonable attorney's fee, and therefore has to obtain credit therefor either from the attorney or from some other person, the reasonable value of the services actually rendered becomes a charge in favor of the bankrupt or of the attorney on all of the bankrupt estate equally with the other costs of administration. This view is in harmony with, and strongly supported by, the provision that a debtor may, in

contemplation of the filing of a petition to be adjudged a bankrupt, pay money or transfer property to an attorney to a reasonable amount, to be judged of by the court, for services to be rendered in the bankruptcy proceedings. In case the payment so made shall in the judgment of the court exceed a reasonable fee, the excess may be recovered by the trustee for the benefit of the estate. Section 60d. In the case we are considering the schedules and the testimony show that there is no estate in bankruptcy, unless the property which the law of the defendant's domicile exempts from levy and sale under judicial process from the payment of debts constitutes a part of the estate in bankruptcy. All of the evidence conduces to show and constrains us to conclude that, since the fall of 1894, the appellee has had no property which is not exempt from levy and sale under judicial process for the payment of debts by the terms of the constitution and statutes fixing such exemptions in the state of Alabama. What effect the waiver evidenced by the judgment in the case of Sellers & Orum may have will be discussed further on in this opinion. If the $50 borrowed from Rushton at the time of preparing the petition and exhibits presented to the court to be declared a voluntary bankrupt became a part of the estate in bankruptcy as soon as it passed from Rushton's hand into the hand of the bankrupt on its way to the attorneys, the payment of it to the attorneys for their fee and to meet the cost of giving notice to the creditors, if the fee and cost charges were reasonable, was a valid disposition of that much of the estate. It is objected that the schedule did not make particular mention of a gold watch worth $50, which the bankrupt owned at the time his petition was filed. In his examination before the referee on October 5th the appellee said that in the item "personal wearing apparel" in Schedule B he included the watch which he habitually wore; that, exclusive of the watch, his personal wearing apparel did not exceed in value $25. He claims his personal wearing apparel, including the watch, as exempt property, under section 2037 of the Alabama Code, which provides that the personal property of a resident of that state to the amount of $1,000 in value, to be selected by him, and, in addition thereto, all necessary and proper wearing apparel for himself and family, and all family portraits or pictures, and all books used in the family, shall also be exempt from levy and sale under execution or other process for the collection of debts contracted after the 23d day of April, 1873. The Code of Alabama provides:

"The words 'personal property' include money, goods, chattels, things in action and evidences of debt, deeds, and conveyances." Chapter 1, § 2.

It has been repeatedly and uniformly decided by the supreme court of Alabama that the exemption laws are founded in a spirit of humanity and benevolence, and are to be liberally construed, and that such a rule of construction requires them to attach to the phrase "personal property," as used in those laws, a signification so comprehensive as to embrace everything which is the subject of ownership, not being realty or an interest in realty. Enzor v. Hurt, 76 Ala. 595. In a general sense and within comprehensive signification attached to the phrase "personal property," as used in the Alabama exemption laws by the supreme court in the case just cited, that phrase includes

wearing apparel. It is clear, however, that section 2037 draws some distinction between personal property and the necessary wearing apparel, family portraits, or pictures and books used in the family. We have not found in the statutes of Alabama or in the decisions of the supreme court of that state a definition of the phrase "wearing apparel," as it is used in this section. The only limitation which the section puts upon the meaning of the words is that the apparel shall be necessary and proper for the wearer or his family. This includes what is merely proper, as well as what is necessary. And, subject to this qualification alone, there is no limitation put on the quantity, quality, or value of the property which the words used describe. The nature of the case, the reasonable average conditions of life, will sufficiently restrict the amount in quantity and value of articles kept by insolvent debtors to be worn on their persons. The homestead exemption is limited in Alabama both in value and in area. Personal property, as distinguished from wearing apparel, family portraits, or pictures and books used in the family, is exempt to the value of $1,000. This is not restricted to designated articles. The right to select the property protected from seizure and sale for debt at any time before or after the levy of process and before actual sale is secured by the constitution beyond the power of the legislature to abridge it. It is fully recognized by the Code:

"Any person by an instrument in writing may waive his right to an exemption in any property exempt from levy and sale under execution or other process." Section 2104.

As to personal property, the waiver may be made by a separate instrument in writing, subscribed by the party making the same, or it may be included in any bond, bill of exchange, promissory note, or other written contract executed by him. Section 2105. That "a waiver of exemptions as to personal property" written in a promissory note will subject wearing apparel to levy and sale under execution is by no means clear. As was said in Enzor v. Hurt, supra, the exemption laws are founded in a spirit of humanity and benevolence, and should be, and uniformly have been, liberally construed. We have not found it said or suggested in the opinions of the supreme court of Alabama that the provision for waiving exemption as to personal property made by section 2105 should receive like liberal construction. It would seem to be the better view that, as the waiver operates as an exception to the general rule, as such exception it should be construed strictly,—not so strictly as to destroy or diminish the force of the exception, but so as not to extend "a waiver of exemption as to personal property" to wearing apparel. The question whether a watch of reasonable value, habitually worn by a debtor, is a part of his wearing apparel, within the meaning of those terms as used in exemption statutes, has been considered by the courts of several of the states, and answered affirmatively or negatively by them, according to the general scope of their respective exemption laws and the particular circumstances of the case in which the claim to the exemption was made. 29 Am. & Eng. Enc. Law, pp. 39, 40, notes. The phrase "wearing apparel," as used in exemption laws, has its popular sense, and includes all the articles of dress generally worn by per-

sons in the calling and condition of life and in the locality of the residence of the person claiming the exemption. It includes whatever is necessary to a decent appearance and to protection against exposure to the changes of weather, and also what is reasonably proper and customary in the way of ornament. A plain gold watch worth not more than $50 is not usually worn habitually by farmers and country merchants as an ornament; but in this day, when everything moves on schedule time, a watch is an eminently useful, if not an absolutely necessary, article of dress. We conclude that where, as in Alabama, the exemption laws embrace the homestead of every citizen, and such personal property as he may have to the extent in value of $1,000, "and, in addition thereto, all necessary and proper wearing apparel for himself and family," a fair construction of this last provision will include within the meaning thereof the watch worn by the appellee. Under different statutes in other states than Alabama, the decisions are conflicting.

It is further objected that the appellee did not include in the schedule of his property a debt of about $600 which his wife owed him. For "a long time" the appellee was engaged in the mercantile and the planting business, carried on in connection with each other, in the country, in the manner that such associated business is conducted in the cotton-growing states. He had sons who sometimes wore the gold watch which he usually wore. In 1890 he married the wife referred to in this objection. At the time of their marriage she owned several lots in the town of Ramer, in Montgomery county, and a small farm near that town, from which property she has been getting an annual rent of about $200. She seems to have had also $400 or $500 in money. The year after their marriage she bought a farm from Webster for the price of $1,400, of which she paid $500 in cash, and the balance in the fall of that year. The rent of this farm for that year was not included in her purchase. For the subsequent years this place brought her an annual income of from $250 to $350. Some time in the summer or early fall she got a small amount of money from her husband to pay on this purchase, and, at the time of making the last payment, in the fall of 1891, he let her have about $500. The number and character of his creditors and the amount in face value of credits extended to him show that he had enjoyed good standing as a business man for some time previous to his failure, in the fall of 1894. It is matter of common knowledge that in 1891 cotton, the chief staple farm product grown in the state of Alabama, brought in the market a good price. It was at this time that the appellee let his wife have the money. From all that the record shows we must conclude that, if at that time he had given her this money outright, the appellants could not then have complained or now complain. After this transaction with his wife the appellee gave one of these appellants a note containing "a waiver of exemptions as to personal property." This waiver created no lien on any property. Craft v. Stoutz, 95 Ala. 245, 10 South. 647. The note was not put in judgment until March 3, 1898. On October 5th (if never before) the appellants obtained full knowledge of these transactions had between the appellee and his wife in 1891. The appellee took

no note for the money and made no entry on any book, and made no other memorandum of it. He says that he did not and does not keep any books between himself and his wife; that he never asked her to pay it back to him; that one might say she owes it; that she really owes it, but that he does not exact it of her. If, in fact, this transaction created the relation of debtor and creditor between the appellee and his wife, and the debt is still subsisting, though not renewed by any subsequent promise, and payment of it has never been demanded, and is not now exacted, and by the force of the waiver it is, under the laws of Alabama, subject to seizure by garnishment or other process to satisfy the appellants' judgment, there is nothing in the pending proceedings in bankruptcy to obstruct the use of such process from the state court. Giving the waiver the full effect claimed for it by the appellants, it would vest the right to this chose in action in the trustee, not as a part of the estate in bankruptcy for the benefit of creditors generally, but for the benefit of this one creditor to the exclusion of a great number of creditors whose debts aggregate nearly 100 times as much as his. Conceding that this alleged debt exists, it is a part of the personal property of the bankrupt, which has not been reduced to his possession, and he has no material part of it or evidence of it, or other thing in connection with it, which he can voluntarily surrender or be made to surrender by a summary rule against him. If the right to it has vested in the trustee, unless the wife voluntarily pays it or consents to submit herself to the jurisdiction of the court of bankruptcy, it can be recovered by the trustee, if at all, only by legal proceedings in the state court substantially identical with the proceeding which the appellants could have used had no adjudication in bankruptcy been had, and which, in our opinion, they still have the same right to use that they would have, if the bankruptcy proceedings were not pending. "All property of the wife held by her previous to the marriage, or to which she may become entitled after the marriage in any manner, is the separate property of the wife and is not subject to the liabilities of the husband." Section 2520. "The earnings of the wife are her separate property." Section 2521. "The wife has full legal capacity to contract as if she were sole, except as otherwise provided by law." Section 2526. "The husband and wife may contract with each other, but all contracts into which they enter are subject to the rules of law as to contracts by and between persons standing in confidential relations; but the wife shall not, directly or indirectly, become the surety for the husband." Code Ala. c. 60, § 2329. There was no proof offered tending to show that the wife had or claimed any other property than that disclosed by the bankrupt in his testimony before the referee, or that the property she owned had been acquired in any other manner than that shown by him. All of the items embraced in the foregoing objections amount in value to only $700. Personal property, as distinguished from wearing apparel, family paintings or pictures, and books used in the family, and in addition thereto, is exempt under the law of Alabama, as we have seen, to an extent beyond the amount of these three items. The act of bankruptcy does not affect the allowance to bankrupts of the exemptions which are prescribed by the

state law. Bankruptcy Act, § 6. The courts of bankruptcy have jurisdiction to determine all claims of bankrupts to their exemptions. Section 2 (11). It is the duty of trustees to set apart the bankrupt's exemptions, and to report the items and estimated value thereof to the court as soon as practicable after their appointment. Section 47 (11). Exempt property is excepted from that the bankrupt's title to which is vested by operation of law in the trustee. Section 70a. On this subject Collier, in his work on Bankruptcy, says:

"A court of bankruptcy has no jurisdiction over exempt property other than to hear and determine the claims of the bankrupt, if disputed. It may restrain its own officials from interfering with it; but that is a jurisdiction over them, not over the property. It will not give any aid to the bankrupt in enforcing his rights as to the exempt property beyond preventing the trustee from interfering with it. To the state courts is left the decision of all questions that may arise between parties as to such property. The bankruptcy court cannot properly entertain a proceeding to enforce a lien upon such property." Coll. Bankr. pp. 74, 75.

There is lurking through all the record made in this case by the appellants from their first appearance before the referee an implied suggestion that much of the property now nominally owned and held by the appellee's wife and by the appellee's brother, N. J. Bell, is in fact the property of the appellee. It is now more than four years since the appellee's failure in business and the transfer of his assets real and personal to his brother, N. J. Bell. The bankrupt law does not open any door for inquiry into such transactions as occurred before the passage of the act, or into such transactions occurring after the passage of the act, but more than four months before the beginning of proceedings in bankruptcy. Moreover, it appears that these parties and the appellants reside in the same county; that the wife and the brother have real estate more than sufficient to satisfy the claims of the appellants; and, if the wife and the brother have been and continue to be parties to the fraudulent concealment of the appellee's property, there exists in the state of Alabama a court of chancery clothed with power to search the conscience of each of these parties and strip the veil from their simulated dealings, and make discovery of the property of the appellee, if he has any in the hands of these near kindred. Code Ala. §§ 819, 822.

The only objection remaining to be considered is that the appellee willfully and knowingly swore falsely when he stated in the affidavit which accompanied his petition that he was without, and could not obtain, the money with which to pay the fees of the clerk, referee, and trustee. Another statute of the United States provides that any citizen entitled to commence any suit or action in any court of the United States may commence and prosecute to conclusion the same without being required to prepay fees or give security therefor before or after bringing the suit or action, upon filing in the court a statement under oath, in writing, that, because of his poverty, he is unable to pay the costs of the suit or action which he is about to commence, or to give security for the same, and that he believes he is entitled to the redress he seeks by such suit or action; setting forth briefly the nature of his alleged cause of action. 27 Stat. 252. The bankruptcy act provides that any person who owes debts, except a

corporation, shall be entitled to the benefits of this act as a voluntary bankrupt. Section 4. In each of the sections referring to the fees of the referee, trustee, and clerk, required to be paid in bankruptcy proceedings at the time of the filing of the petition, there is a reservation made by the insertion of these words: "Except when a fee is not required from a voluntary bankrupt." Sections 40, 48, 52. It is made the duty of the clerk to collect the fee of the clerk, referee, and trustee in each case instituted before filing the petition, except the petition of a proposed voluntary bankrupt which is accompanied by an affidavit stating that the petitioner is without, and cannot obtain, the money with which to pay such fees. Section 51. The general orders in bankruptcy, which have the force of statutes, provide:

"In any case in which the fees of the clerk, referee, and trustee are not required by the act to be paid by a debtor before filing his petition to be adjudged a bankrupt, the judge, at any time during the pendency of the proceedings in bankruptcy, may order those fees to be paid out of the estate; or may, after notice to the bankrupt, and satisfactory proof that he then has, or can obtain, the money with which to pay those fees, order him to pay them within a time specified, and, if he fails to do so, may order his petition to be dismissed." Gen. Order 35, par. 4 (32 C. C. A. xxxiv., 89 Fed. xiv.).

"Before incurring any expense in publishing or mailing notices, or in traveling, or in procuring the attendance of witnesses, or in perpetuating testimony, the clerk, marshal, or referee may require, from the bankrupt or other person in whose behalf the duty is to be performed, indemnity for such expense. Money advanced for this purpose by the bankrupt or other person shall be repaid him out of the estate as part of the costs of administering the same." Gen. Order 10 (32 C. C. A. xiii., 89 Fed. vi.).

The evident intent and spirit of the general law which secures all citizens entitled to bring any suit or action in the courts of the United States, the right to commence and prosecute the same, though they have not the means to pay or secure the costs, and the careful mention, four times repeated in the bankruptcy act, that the prepayment of fees is not required from a debtor who is without, and cannot obtain, the money with which to pay the same before filing his petition to be adjudicated a voluntary bankrupt, show that this class of litigants is not viewed with disfavor by the laws of this country. The last paragraph but one of the present law shows that petitions for voluntary bankruptcy are not disfavored. On the contrary, they might be filed after the expiration of one month from the passage of the act, while no petition for involuntary bankruptcy was permitted to be filed within four months of the passage thereof. In cases of voluntary bankruptcy, a schedule showing all of the property of the petitioner must accompany the petition. Upon the filing thereof, the right of the petitioner to sell or charge any part of the property embraced therein, and not excepted from that the title to which will be vested as of the date of the adjudication of bankruptcy in the trustee when appointed and qualified, immediately ceases. Although the courts may appoint receivers, or the marshal upon application of parties in interest, when absolutely necessary for the preservation of estates to take charge of the property of bankrupts after the filing of the petition and until it is dismissed or

the trustee is qualified, it is the duty of the bankrupt himself in involuntary cases, and much more in voluntary cases, to keep careful charge of and preserve all the property which, upon his being adjudged a bankrupt, will vest, by operation of law, in the trustee as soon as one shall be appointed and qualified. The actual and necessary cost, if any, of preserving this property subsequent to the filing of the petition, by whomsoever it is expended, is to be paid in full out of the estate first after the payment of taxes. There is no indication in the act that the petitioner in voluntary cases may not after filing his petition, and before obtaining his discharge, earn, according to his ability, a living for himself and family, or that he may not use all of his earnings as he may himself elect for that purpose, or that he shall in any manner account to the court for the same. Neither is there any indication in the law that any of the expenses of the bankruptcy proceedings are to be a charge on the property which, by the law of the bankrupt's domicile, is exempt from forced sale for the collection of debts, and on that account excepted from the bankruptcy estate by section 6 of the act. The whole purview of the act is opposed to the thought that the fees of the clerk, referee, and trustee are made, or in any event are to become, a charge upon the personal earnings of the bankrupt accruing after he is adjudged to be a bankrupt, or a charge on the exempt property, which is not in any case to be affected by the bankruptcy act. Its whole character is infinitely removed from that of our former laws, which used physical duress by incarceration as a means by which the debtor, or his friends through sympathy for him, were coerced into paying the debt, and he was punished for owing it. Though this evil spirit has been fully exorcised from the whole body of our national law and from the laws of Alabama, the idea or sentiment out of which it sprang and in accordance with which it was administered still lingers in the minds of some of our citizens. All such processes for collecting debts are forbidden by the constitution of Alabama. Ex parte Hardy, 68 Ala. 303.

The record in this case shows that the clerk of the court of bankruptcy where this proceeding is pending was examined before the referee, and was asked by the counsel for the appellee:

"Q. Was there what is known as the 'inability oath' made in this case? A. There was. Q. Do you know, as a matter of information connected with your office, that the judge of this district, as well as judges in other districts, have stated judicially that they would refuse to allow a discharge in bankruptcy to a man who has taken that oath? A. I do not understand clearly about this proposition. I have not looked into the question very closely. Once I heard some discussion about the question in a vague, hazy way. We have discharged one man who has made that oath without paying his fees."

We find in a text-book, from which we have received much assistance in our effort to construe the provisions of the bankruptcy act, this paragraph:

"In various districts, we are informed, rules have been promulgated which tend to expedite the cases in which the fees have been paid in preference to those which are prosecuted in forma pauperis. We believe it may be safely asserted that a bankrupt, by paying the small fees im-

posed by the law, not only will be paying a debt morally as well as legally due,—the payment of which any person, however insolvent he may be, can accomplish by borrowing from his friends,—but he will undoubtedly find that, by paying such fees, he will be advancing his own interests." Coll. Bankr. p. 570.

If these ideas are to find permanent lodgment in the minds of the judges of the courts of bankruptcy and become active, the carefully expressed provisions of the bankruptcy act granting the right to insolvent debtors to present their petition for relief in some cases in forma pauperis will not only be denied, but this humane and benevolent bounty from the government will be tortured into a most malignant snare. It is manifest that paragraph 4 of general order 35 relates only to cases in voluntary bankruptcy, and the language shows that there may be such cases in which the petitioning debtor is not required to pay the fees of the clerk, referee, and trustee before or at the time of filing his petition, although he presents a schedule of property in excess of the exemptions allowed by the law of the state of his domicile and surrenders an estate in bankruptcy. Otherwise, it would be futile to provide that "the judge at any time during the pendency of the proceedings in bankruptcy may order those fees to be paid out of the estate." The terms of the affidavit, as prescribed by section 52, are "that he is without, and cannot obtain, the money with which to pay such fees." This affidavit may well be made in cases in which there is an estate to be surrendered, consisting not in money or in property that has a market value or can be converted into money by the petitioning debtor without substantial sacrifice of its value, and from which, therefore, he could not obtain the money in the exercise of perfect good faith towards the court and his creditors. Upon the presentation of his petition and schedules, accompanied by the affidavit in the terms of the statute, the clerk has no option as to filing the petition and taking the action thereon prescribed by the law. The judge of the court of bankruptcy, on the motion of parties interested, or on his own motion, after notice to the bankrupt, may have satisfactory proof that the bankrupt has not made a full surrender of his assets, and that he then has, or can obtain, the money with which to pay those fees. There is nothing in this paragraph 4 in the nature of an amendment of the bankruptcy act or out of line with our construction of its provisions. It does not require the petitioning debtor to use, sell, or pledge his exempt property, for that would be repugnant to section 6, Bankruptcy Act. It does not require that he should apply to his kindred or friends to furnish him the money, at the peril of being charged with and convicted of making a false oath should he tender the statutory affidavit, and having his prayer for a discharge refused on that ground, or having it indefinitely delayed on that account, for this would be a refinement on our former laws prescribing imprisonment for debt. It does not impose any humiliation on a citizen to accept the bounty of the government in providing that he may obtain the benefit of the act without the prepayment of any fees; but it would inflict a humiliation on any citizen to require that he solicit or accept alms of his kindred or friends. The judgment of the court of bankruptcy granting the appellee his discharge is affirmed.