## THE SERAPIS.

### SMITH v. THE SERAPIS.

#### (Circuit Court of Appeals, Fourth Circuit. May 25, 1892.)

#### No. 7.

1. MASTER AND SERVANT—NEGLIGENCE—MACHINERY—OLD PATTERN.
    Where a workman is employed to do certain work with a machine which he fully understands, though it may not be of the newest pattern, and may require more care than newer patterns, but nevertheless is in perfect order of its kind, he takes the risk of all accidents which may befall him in its use.
2. SAME—WINCH WITH UNCOVERED COGWHEEL.
    Libelant, a stevedore, was driving a winch on the steamship Serapis. The cogwheels were uncovered, but libelant, while looking at the hatch back of him, put his hand between the wheels, where it was crushed. The winch had no covering over the cogwheels, with which winches are now customarily made, but was in good order of its kind. Libelant had worked at it for several hours before the accident, and knew all about it. The mate had warned him to be careful. *Held*, that libelant's negligence was the sole cause of the accident.
    GOFF, Circuit Judge, dissenting.
    49 Fed. Rep. 393, reversed.

Appeal from a Decree of the District Court of the United States for the District of Maryland.

In Admiralty. Libel for personal injuries. The court below awarded libelant one half his damages. 49 Fed. Rep. 393. **Reversed.**

*Convers & Kirlin*, W. *Benton Crisp*, and J. *Parker Kirlin*, for appellant.
I. *Cookman Boyd* and *Charles Herzog*, for appellee.

Before HUGHES, District Judge, and BOND and GOFF, Circuit Judges.

BOND, Circuit Judge. It appears from the record in this case that some time about the 1st of January, 1891, the steamship Serapis arrived at the port of Baltimore with a cargo of iron ore. Upon her arrival she made a contract with a head stevedore, who had a gang of other stevedores in his employ, experienced in the business, to unload the ship. The Serapis ranked A 1 at Lloyd's, and was fitted up with two winches in the usual position on the ship, which had been on her for six years, and had been made by the first machinists in Liverpool. The record shows that these winches were in perfect order, and no objection was made to them by the head stevedore, with whom the contract to unload the vessel was made. The libelant, Smith, was set to work at first to manage the winch, while the cargo was taken out of a forward hatch. Of course his face was turned towards the hatch in front of him, and he could see from his position whether it was time to wind up the winch or let it go,—to hoist or lower the buckets, into which the ore was placed. He worked the winch for four or five hours in the nighttime while the forward hold was being emptied of cargo. A fellow stevedore was placed in the proper position at the hatch to let him know when he was to lower or hoist. This he did vocally or by a wave of the hand. The next morning Smith was put to use the same winch, but the hatch out of which cargo was to be taken was behind him. A stevedore was placed there to give him notice what to do with the winch, but Smith, unmindful of this fact, turned his head behind him to see for himself when and how to move the winch. By so doing he lost sight of the wheel by which steam was turned on or off, and placed his hand on the cogwheels instead of the wheel, and lost several of his fingers.

If the libelant felt called upon to look behind him to watch the hatchway where the stevedore was placed to give him notice what to do, because the stevedore so stationed did not do his duty, and call out to him what to do, this was negligence on the part of a fellow employe, with whom the ship had nothing to do, for he had been employed by the head stevedore, as Smith had been, and not by the ship. The libelant contends that although he may have been negligent in turning his head to watch the hatch behind him, yet, if the winch had had its cogwheels covered, he would not have been injured, notwithstanding his negligence. The winch at which libelant was working had, as the record shows, been on the Serapis for six years, and cargo after cargo had during that time been discharged by its use. There is no evidence whatever that it was not in perfect order for that style of machine. The libelant knew all about it, for he had worked at it the night before for four or five hours, and an hour and a half on the morning of the accident. It was not peculiarly dangerous in its construction, for the valve wheel was even further away from the cogwheels than usual, though the evidence here somewhat conflicts. The captain, however, states that he measured it, and its dis-

tance from the cogwheels was 12 inches. The libelant states that he told the mate that there ought to be something over the cogwheels, but he said: "You be a little careful, and it will be all right."

Now, the question is whether the owners of the steamship Serapis can be called negligent because they had on board the steamer a winch which had been there for six years, in continual use, was in perfect order, but required more care on the part of the person who worked it than some more modern machines of the kind. And this, too, when the machine was well known to the employe, and that it required somewhat more attention on his part than other machines fitted for similar use. We are of opinion that where a workman is employed to do certain work with a machine which he fully understands, though it may not be of the newest pattern, but nevertheless is in perfect order of its kind, and may require more care than newer patterns, he takes the risk of all accidents which may befall him in its use. And if, as is the fact in this case, he did not exercise the care required, he must suffer the consequence of his negligence. This libelant's misfortune has our deepest sympathy, but to do injustice through sympathy for the injured is to do away with law, and make recovery for loss dependent on the tenderness or want of it in the feelings of the court. We think the decree of the district court in this case should be reversed; and it is so ordered.

GOFF, Circuit Judge, (*dissenting.*) I think the decree of the district court should be affirmed. The libelant was one of the stevedores employed in unloading a cargo of iron ore from the steamship Serapis, in the port of Baltimore. Two winches were used by the steamship in unloading its cargo,—one for hoisting the ore out of the hold of the vessel, and the other to draw the crane to and from the wharf. Libelant was assigned by the head stevedore to the duty of running the last-mentioned winch, and while so employed his hand was caught between the cogs of the driving wheels, crushed, and permanently injured. He claims that the winch at which he worked was dangerously constructed, not properly guarded to protect those employed to work it; and that it was negligence on the part of the ship owners to keep it in that condition.

I think the testimony shows that the winch was dangerously constructed,—unnecessarily and unusually so. The valve stem is immediately in front of the cogs, and the wheel on the top of it, by which it is moved, is directly opposite the meeting place of the teeth of the cogs. While there is some conflict in the testimony on this point, the weight of the same is that the distance from the cogs to the wheel is not more than from five to seven inches. The stem is controlled by a valve near the deck at the feet of the winch man, from which the valve stem rises about three and one half feet, and on which is the wheel. There was no covering or guard over the cogs to protect the hands of the operative, as is usual in machines of this character; that could have been easily and at a trifling expense affixed. It is clear to my mind that it was improper to provide such a winch for such work, and that the steamship in doing so was guilty of negligence. It is no answer to this

to say that the winch was used for some years without an accident occurring; the wonder is that one did not happen sooner. The testimony does not show that the libelant was inefficient or careless, but that he was an experienced and skillful workman, 33 years of age, who fully understood his business. It is shown that he could not see the tub used in hoisting the ore without turning his eyes from the winch, and that he was compelled to do so while at work, and operate the valve at the same time. When he was so engaged the accident happened. Nor is it an answer to say that the libelant sought the employment and assumed the risk, and that he was not compelled to continue using the machine,—that he could quit work when he pleased. The risk he assumed was that common to such work when proper machinery is furnished. Such men cannot always quit work when they please. On the contrary, they are compelled to labor, and, as I understand the law, it requires those using their labor and providing machinery for that purpose, dangerous in character, to use all reasonable means to guard against accidents, and to protect those employed by them. In considering the duty and the liability of the employer to the party employed, Mr. Justice HARLAN, in *Hough* v. *Railroad Co.*, 100 U. S. 213, said:

"One, and perhaps the most important, of these exceptions arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when conducting the master's business, to perils or hazards against which he may be guarded by proper diligence upon the part of the master. To that end the master is bound to observe all the care which prudence and the exigencies of the situation require in providing the servant with machinery or other instrumentalities adequately safe for use by the latter."

Without quoting further from this case on this point, I cite *Buzzell* v. *Manufacturing Co.*, 48 Me. 116; *Railroad Co.* v. *State*, 44 Md. 283; *Wheeler* v. *Manufacturing Co.*, 135 Mass. 294; *Ford* v. *Railroad Co.*, 110 Mass. 241; also Wharton on the Law of Negligence, (section 211,) where the author says:

"The question is that of duty; and without making the unnecessary and inadequate assumption of implied warranty, it is sufficient, for the purpose of justice, to assert that it is the duty of an employer, inviting employes to use his structure and machinery, to use proper care and diligence to make such structure and machinery fit for use."

But it is contended by the appellant that the libelant cannot recover, because he, in effect, contracted to work the winch, and continued to use it with full knowledge of its defects. The libelant was not employed specially to work the winch, but to do any work usually done by stevedores in unloading a cargo of iron ore from a steamship. He naturally expected to find the vessel provided with such machinery as was usual and proper for that purpose, and as was reasonably safe. When his turn came to run the winch he did so, but he was surprised at its construction, and complained of it. He was told by the mate, so he testifies, "to be a little careful, and it will be all right." Another stevedore,

who was operating the winch the night before the libelant was injured, testifies that the mitten on his hand was caught in the cogs, and taken off, and that when he mentioned the fact to the donkey engine man in charge, and told him that it ought to have a cover on it, the man replied, "Be careful." It is true that libelant knew the machinery was defective, unguarded, and dangerous, but I do not think it follows that, therefore, he lost his right of action against the steamship in case of an accident occasioned thereby. The prevailing rule now on this subject is that the employe need not, when aware of the defect in machinery, abandon the service on that account, but that he may run some risk, such as a prudent man would take, without losing his right of action against the master in case injury results. On this point see Beach, Contrib. Neg. p. 373, § 140, and authorities there cited. It is stated as follows in Shear. & R. Neg. (4th Ed.) § 209:

"Knowledge of a defect in machinery is no bar to recovery as a matter of law. Such knowledge may operate in mitigation of damages. Even continuance in the service after knowledge of a defect is not, as a matter of law, contributory negligence."

The decisions upon this question have been conflicting, still I do not think it can be maintained from them—from those rendered since the general use of the generally dangerous and complicated machinery run by steam—that even at common law the employe is deemed to have assumed all the risk of all danger by continuing to use such machinery after knowledge of its defects. In admiralty the rule in such cases is now well established, and is authoritatively given us by the supreme court of the United States in *The Max Morris*, reported in 137 U. S. 1, 11 Sup. Ct. Rep. 29. Mr. Justice BLATCHFORD, in the opinion in that case, says:

"Contributory negligence in cases like the present should not wholly bar recovery. There would have been no injury to the libelant but for the fault of the vessel; and while, on the one hand, the court ought not to give him full compensation for his injury, where he himself was partly in fault, it ought not, on the other hand, to be restrained from saying that the fact of his negligence should not deprive him of all recovery of damages. As stated by the district judge in his opinion in the present case, the more equal distribution of justice, the dictates of humanity, the safety of life and limb, and the public good will be best promoted by holding vessels liable to bear some part of the actual pecuniary loss sustained by a libelant in a case like the present, where their fault is clear, provided the libelant's fault, though evident, is neither willful nor gross nor inexcusable, and where other circumstances present a strong case for his relief."

The *Case of The Maharajah*, 40 Fed. Rep. 784, and 1 U. S. App. 20, 49 Fed. Rep. 111, is relied upon by the claimant in this case. The libelant in that case, as in this, was injured while working a winch belonging to the machinery of a steamship. In that case the court found from the proof that the winch was in details of structure substantially like those in general use at the time it was built; that it had been in use for a dozen years or more, and that it was not materially out of repair; that such winches are still in common use upon vessels, but that an improved

machine has been introduced, constructed with a guard over the cogs. In the present case the evidence shows that the winch was unusual; was not the kind commonly in use, but of the class known as a "camel-back," but unlike them in not having a guard for the cogs. One witness states that, while he had seen such winches before, they had always been protected with guards. Another testifies that this one was differently constructed from the other "camel-backs" he had seen. The libelant testified that he had worked at a hundred different winches, and that on the others the valve wheel was further from the cogwheels. Still another witness says that he had worked on many winches, and had seen "camel-backs," but they "all had casings." Another ran the winch after the libelant's hand was crushed, and on that account noticed it particularly. He saw the "flesh and blood on the cogs," and noticed that the valve was too close to the cogs for safety,—only from five to six inches off, he says. He had seen many winches like this one, but they all had guards. In the *Case of The Maharajah* there was no notice given of the defect; in this case there was. So while the cases in several particulars are similar, so far as the testimony on these material points is concerned, they are quite different. I infer from the opinion of the court, delivered by Judge WALLACE in the circuit court of appeals, that, had the proofs been different as to the dangerous character of the winch in use on the Maharajah, the decision of the court would have been in accordance with the equitable ruling of the supreme court of the United States in the *Case of The Max Morris*. For the reasons mentioned I see no error in the decree appealed from, and think it should be affirmed.