OREGON ROUND LUMBER CO. v. PORTLAND & ASIATIC S. S. CO. et al.

(District Court, D. Oregon. May 25, 1908.)

No. 4,893.

1. MASTER AND SERVANT—INJURY TO SERVANT—ASSUMPTION OF RISK.
 A man casually employed to work on a barge in coaling a ship in port does not sustain such contractual relations as a seaman as to exempt him from the general rule relative to assumption of risk.

2. SHIPPING—SINKING OF VESSEL—UNSEAWORTHINESS.
 The sinking of a vessel while being properly handled, without undue stress of weather or other known external cause, was presumptively due to unseaworthiness.

3. SAME—LIMITATION OF LIABILITY—PRIVITY OF OWNER.
 In a suit by a corporation for limitation of liability as owner of a vessel for a loss due to unseaworthiness, the privity of libelant with its condition, within the meaning of Rev. St. § 4283 (U. S. Comp. St. 1901, p. 2943), is measured by that of its managing officers.
 [Ed. Note.—Limitation of liability of vessel owner, see note to The Longfellow, 45 C. C. A. 387.]

4. SAME—CAPSIZING OF BARGE—UNSEAWORTHINESS.
 A barge, leased by libelant corporation to one of the respondents to be used in coaling a vessel in port, while being unloaded alongside the vessel capsized, and the cargo was lost and one person drowned. The immediate cause of the capsizing was the unusual quantity of water in the hold, which had come in during the latter part of the time she was being loaded. The evidence tended to show that she was loaded and was being unloaded in the usual and proper manner. She was an old vessel, and had been twice extensively overhauled and repaired, the last time some five years before. The superintendant and the manager of the libelant had both been through the hold only a few days previously, but without lights; and it did not appear that they made more than a casual

examination, nor had she been surveyed by any one having skill, and there was evidence that some of her interior timbers were broken. *Held*, that the sinking was attributable to her unseaworthiness. which was not without the privity of libelant, and that it was not entitled to a limitation of liability.

5. MASTER AND SERVANT—INJURY TO SERVANT—ASSUMPTION OF RISK.

Respondent's intestate was hired to pump on a barge from which coal was being discharged into a steamer, and a short time thereafter. while so at work, the barge capsized by reason of unseaworthiness, and he was drowned. He was a carpenter, not acquainted with the work. and was not instructed nor warned of any danger, which in fact was not apprehended by those in charge until immediately before the sinking. *Held*, that he did not assume the risk from the unseaworthy condition of the barge, of which he had no knowledge or means of knowledge, and that the owner was liable in damages for his death.

[Ed. Note.—Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Admiralty. Proceedings for limitation of liability.

This is a libel and petition in behalf of the Oregon Round Lumber Company for the ascertainment of liability, and, if any be adjudged against it.. then for a limitation thereof, as it respects the sinking of the barge *Monarch*. whereby certain coal, the property of the respondent Portland & Asiatic Steamship Company, was lost, and one Otto Pannier was drowned. The petitioner was the owner of the barge, and on December 23d leased it to the respondent Portland & Asiatic Steamship Company, to be employed in carrying coal from the bunkers or docks of the respondent Oregon Railroad & Navigation Company in Albina to and alongside of the steamship *Arabia*. which was lying at the Montgomery dock, with a view to coaling the ship. A bargemaster was furnished with the barge. and subsequently the libelant employed Pannier to operate a hand pump to assist with the discharge of water from her hold. It is averred, in effect, that the barge was sound, staunch, and in all respects seaworthy for the purposes for which she was to be employed. but that she sank by reason of the lessee's negligence and carelessness in loading her with coal, so that she was not equally and evenly loaded, causing her to heel and list, thus producing an unusual and unnecessary strain upon her timbers and forcing her seams and butts to open and leak, and in unloading her in such a way that all the coal was taken from one end, instead of by distribution evenly about her deck, so that one end and side of the barge was forced under water, causing her to turn over and sink, which resulted in the loss of the coal aboard and the death of Pannier. The barge being appraised, her value was fixed at $250. The respondent Portland & Asiatic Company claims damages for loss of the coal aboard, and the respondent the administrator of the estate of Pannier claims damages for the death of decedent.

Williams, Wood & Linthicum and Hogue & Wilbur, for petitioner. Snow & McCamant, for respondent Portland & Asiatic S. S. Co. A. C. Spencer, for respondent Oregon R. & N. Co. H. H. Riddell and E. B. Dufur, for respondent administrator.

WOLVERTON, District Judge (after stating the facts as above). Preliminary to an examination of the cause upon its merits, the question has again been presented as to whether Pannier, being engaged in a maritime service, was subject to the rule relating to the assumption of risk incident to his employment. I held, on a previous hearing on exceptions to the libel, that a seaman, in his employment as such, was not subject to the rule, and this under the authority of Lafourche Packet Co. v. Henderson, 94 Fed. 871, 36 C. C. A. 519. From a further

consideration, on reargument of the principle, I am convinced that the doctrine of that case, while sound, does not apply to the one in hand, and that the ordinary rule should obtain here. In the Packet Company Case a sailor entered into contract or articles to ship as a seaman, and while engaged in that service was injured. It was held that as to him the rule of assumption of risk did not apply, because he was not at liberty to refuse the work, and could have been arrested and returned to the ship, had he deserted and declined to do the bidding of the master; so that there was presented a technical case of a seaman shipping under contract as a sailor. The case here is quite different. Pannier was simply employed as a hand to go aboard of the barge, and was under no articles to embark as a sailor or seaman. He was not bound to remain in the employ of his employer a minute after the conditions became apparent to him, if he had not so desired. His was the position practically of a longshoreman engaged in duty aboard the ship while in port, and his relations to his employer must be subordinated to the rules governing in such cases. Many cases attest his assumption of the risk of his employment in such a relation. I will allude briefly to some of them. In the Maharajah (D. C.) 40 Fed. 784, the workman was a longshoreman, engaged to work at a winch on board ship while in discharge of her cargo, and was injured. It was held that he assumed the risk of the dangers attending his employment. This case was affirmed on appeal to the Circuit Court of Appeals. 49 Fed. 111, 1 C. C. A. 181. In.The Serapis, 51 Fed. 91, 2 C. C. A. 102, the workman was a stevedore. The circumstances attending the injury were very similar to those in the case of The Maharajah, and the holding was the same. So in The Luckenbach (D. C.) 53 Fed. 662, which was the case of a fireman employed on a tug, the rule was applied. Pannier's duty does not distinguish his employment from the employment of the several parties involved in these cases, and there is no reason for the application of a different rule as to him. The question, therefore, whether Pannier did in reality assume the risk of the mishap resulting in his death is resolved into one of fact, which will be considered later.

The primary inquiry must necessarily be whether the petitioner has incurred any liability, and, if it has, then whether it is entitled to a limitation thereof. It is pertinent, therefore, to ascertain whose acts were the conducing cause of the capsizing or sinking of the barge. To relieve the record of confusion, it should be stated that it is alleged by the libel that the respondents the Portland & Asiatic Company and Oregon Railroad & Navigation Company were lessees of the barge; whereas the Portland & Asiatic Company was the only lessee, while the coal was obtained from the Oregon Railroad & Navigation Company, and the towing was done by the Henderson, a boat owned by neither. Under the pleadings, the first issue is, was the barge seaworthy when leased? And the second, whether the lessee handled and navigated the barge in such a way as to cause her to capsize.

The barge was of the model pattern, 170 feet in length, 38 feet beam, and about 8 feet depth of hold, and was constructed in 1877. There is but little testimony as to the manner of her use until after she was in a measure reconstructed in the year 1900. J. A. Johnson

purchased her in May of that year from George W. Weidler, at a consideration of $500, and took her to Lewis river for repairs. The repairing was done while she was in the water, and without docking, beaching, or putting her on the ways. Her deckhouse was torn away, and her deck lowered a foot; entire new beams and decking being supplied. One keelson was put in anew, and the others repaired. A new king-post was supplied, so with the bulkhead, and a system of cross-bracing carried through her frame for reinforcement and to render her more stable and durable. In connection with the deck and beams, new posts, braces, and tendons were put in. Two or three pieces of the planking were taken from the hull and new ones substituted, and the barge was recalked where needed. Large quantities of salt were found in her salt boxes, which were in good condition, and about two tons more of salt were added. The work was commenced in May and continued to the following December, and, when completed, her owner and the workmen considered that she was in good A 1 condition. Being thus repaired, she was used about two years for transporting wood, ties, and other lumber, carrying upon her decks from 400 to 600 and 700 tons, and even more, at a time. It is related that a load of 450,000 feet of green lumber was left lying upon her deck for nearly three months at one time without removal. Capt. Hosford, with Gerspach, became interested in the barge later, and in November, 1902, she was again repaired; this time by taking out the transom, shortening the planking by six inches or more, because the ends were found to be decayed more or less, and putting in the transom anew. Planking to the extent of about 100 feet was removed and replaced upon the hull, and the vessel recalked, consuming about nine bales of oakum, all at a cost of $613. Hosford and Gerspach sold to the libelant a part interest in the barge in the fall of 1902, and the remainder in the spring of 1903, at which time they (Hosford and Gerspach) affirm she was in good condition. During the time that Hosford and Gerspach owned her, they used her for transporting ties, and carried near 800 tons upon her at one time. They say that 700 tons was about her carrying capacity.

D. C. O'Reilly, manager of the lumber company, testifies that at the time his company finally purchased the barge she was in good condition; and such is the opinion of his brother, R. J. A. O'Reilly, also interested in the libelant company and the superintendent thereof. The purchase price paid by the lumber company was $2,700. During the company's use of her, it loaded her with ties out of Lewis river, in weight running from 700 to 800 tons. The company made no repairs in any way, except to furnish a new steam boiler and siphon, a few days before she was leased to the Portland & Asiatic; the barge being supplied also with a hand pump. D. C. O'Reilly testifies that he had been in the barge several times, and that at the time she was leased to the Portland & Asiatic she was in good, seaworthy condition; also, on cross-examination, as follows:

"Q. When did you last inspect the barge? A. About three or four days before the Oregon Railroad & Navigation Company took her. Q. That is, this last time? A. Yes. Q. You went through her? A. Yes; I went into her hold. Q. Whereabouts was it? Where was she when you inspected her

then? A. Laying at our moorings. Q. At your dock? A. Yes. Q. What was the occasion? What was the purpose of your inspection? A. Well, when I go down on the barges, I generally go into all of them—see what shape they are in. It is a matter of general custom. Q. What did you do in the course of that inspection? A. How do you mean? I went down through her hold. Q. Just looked her over—that is all? A. Yes. Q. Made no tests of any kind? A. No. Q. Was she leaking any then? A. No; she was lying there, light. They always have three or four inches of water in them."

And R. J. A. O'Reilly testifies that he was down in her hold about 10 or 12 days before she was leased, when the new siphon was put in, and that, so far as he could see, her condition was "all right—in good shape." And on cross-examination:

"Q. You say you examined the barge a few days before this accident? A. No; I was in the hold of the barge when we put this new siphon in. That is probably 10 or 12 days before. Q. You went in there for that purpose? A. Yes; and then I went all through the hold, too. Q. You didn't make any particular inspection of it? A. I looked around. That is about all the inspection you can make—see anything that is wrong."

This comprises, in substance and effect, the testimony of libelant on the subject of the seaworthiness of the craft. Prior to the leasing in this instance, the barge was used by the Portland & Asiatic Company for transferring coal on the Elleric from her after hatch to her bunker, and was engaged in this service from December 9th to the 16th. William J. Seaman was the bargemaster aboard. He made an examination of the barge, so that he became acquainted with her condition. He testifies that when he went aboard the barge had just been siphoned out by a steamer; that he did not then go into her hold, but did a little later—in fact, that he went into her hold every day; that he moved the pump that was forward aft to the cabin; that in doing so he went down the forward hatch, and thence the full length of the boat, walking upon her keelsons; that there were three keelsons, two of which seemed to be sound; that one of them, the main keelson, was broken entirely in two, and that it stood apart 4 or 4½ inches, which tended to render the vessel unseaworthy; that there was a regular network of braces and cross-timbers in the barge; that some of the braces ran from the sides to the bottom of the keelson, and others were fastened to the ribs above, and some ran from the keelsons fore and aft, being quite lengthy; and that witness noticed that one of the bracings had forced out a plank, thus producing an aperture admitting the water quite freely. The witness further relates that during the time D. C. O'Reilly made inquiry of him as to what he thought of the barge's condition, and that he told O'Reilly that he "thought she was in pretty bad shape, mighty poor old box, something like that." And on redirect examination he states that the main braces running from the side keelsons forward to the main keelson were pulled away from the keelson, being within a foot of the break therein, which had a tendency to weaken the frame of the barge.

In rebuttal of this testimony, D. C. O'Reilly says that he was down in the barge a day or two before the accident, and that he did not see any break in the keelson; that he had been in her several times during the time he owned her; and that if there had been any broken keelson, he thought he would have known it. He also says that he saw noth-

ing of the bracing being pulled apart from the keelson. It was further developed that he went as far aft in the hold and along the keelson as where the siphon was put in, and that he took no lantern or other light with him.

Edward Dewyl affirms that he knew the boat, and that the keelson had been broken for years.

The barge was leased to the Portland & Asiatic Company on the evening of the 23d of December, 1904, and was taken alongside the Oregon Railroad & Navigation Company coal docks on the morning of the 24th. The arrangement for the barge was made by telephone. between D. C. O'Reilly, representing the lumber company, and Capt. Conway, of the Portland & Asiatic Company. The lumber company was to furnish a man with the barge, whose duties, O'Reilly testifies, "were to act as watchman and caretaker of the barge, represent our interests, and report to us any ill treatment or ill usage of the barge— keep her tied up." Further on he explains what relation the bargemaster sustained toward the loading of the barge. He "was to criticise the way it was loaded or unloaded, and, if attention was not paid to his objections and criticisms," then he was to report to the lumber company, and the company would take it up with Capt. Conway. On cross-examination the witness further testifies that it was part of the duties of the bargemaster to attend to the pumping and to keep the barge free from water, and "to represent the owners in watching how the barge was handled. * * * He was there to report in case it was not loaded properly or unloaded." This testimony shows quite clearly the duty and authority of the bargemaster; and that officer, it may be said, acted entirely within his authority. It may be that he did not act with the promptness and energy that the exigencies called for; otherwise, he was faithful to his employment.

The lessee loaded from 125 to 130 tons of coal on the barge on the day of the 24th, and, the two following days being holidays, nothing further was done until the 27th, when the loading was continued, and was completed on the morning of the 28th. At about the noon hour of the 28th the barge was taken in tow by the Henderson, and carried alongside of the Arabia, and made fast with her stern up stream. At the suggestion of Doyle, the bargemaster, the loading was begun on the forward end of the barge, and continued back to about the center; and the barge was left in that way over the two holidays. On the 27th, after the loading had continued until evening, the Oregon Railroad & Navigation steamer Hassalo came by, and took off some 25 to 30 tons of coal. Later the Harvest Queen took off coal for her use, but at the direction of Doyle coaled from another quarter of the barge, so that the barge would not be left on a strain by reason of unloading unevenly. Doyle asserts that he was able to keep the water out of the hold of the barge by the use of the engine and siphon until the morning of the 28th; that is, that he was theretofore able to pump out in 10 hours what would run in in 24. On the 28th the water gained upon him so rapidly that he reported to O'Reilly shortly before 11 o'clock, but was unable to get any reply until after the barge had been towed alongside of the Arabia. It was while he was away to luncheon that the Henderson took her in tow, and he intercepted her at the Arabia.

This·was near 1 o'clock, or thereafter. He set the siphon to work again, but without making headway. The stevedores began unloading from the forward starboard quarter, and continued so until it was found that the barge was listing upon the outer or port side, whereupon, at the request of Doyle, and also of O'Reilly, who had arrived at the dock in the meantime, the coal was shoveled from the crest on the opposite side, and the barge righted again upon nearly an even keel. The work thus continued until between 4:30 and 5 o'clock, when the barge capsized outward from the ship and sank.

All the witnesses who were at all acquainted with the proper manner of loading a model barge concur in the opinion that she should have been loaded by distributing the tonnage about her deck evenly as the work was going on; that is, by starting in at either end, and putting on from 10 to 15 tons as it would run aboard from the chute, and then shifting backward or forward a few feet, according as the loading was started, putting on about the same amount at each shift, until the deck was covered, and then going over the deck again and again in the same way until the full load was on. Mr. D. C. O'Reilly says:

"A barge of that character should be loaded with her lines—that is to say, to keep her shape, to keep her hog-chains taut; and to do that she has got to be loaded evenly, tier by tier, and unloaded the same way, or, if there is any difference, it should be taken off—the center should be lightered first, if anything," thus keeping her on an even balance to the end.

This was practically the method adopted and employed for loading by the lessee, under the supervision of Smith and by the suggestion of Doyle; but at the end of the day of the 24th coal had been placed aboard extending only to the middle of the barge. This had the effect to put the boat down by the bow and up by the stern, in which position she remained for two days, and until the 27th, when the loading was taken up again, and completed on the 28th. After the holidays, probably in the early part of the 27th, R. J. A. O'Reilly was at the dock, and, noticing that "the coal was a little heavy in one place," directed the bargemaster to arrange to have the barge dropped down, and the coal distributed more evenly, which was done. And the witness says that he (the bargemaster) "started in loading her properly," and that at that time she had on in the neighborhood of 100 tons of coal. This witness further relates that he went to the Montgomery dock, to the Arabia, between 3 and 4 o'clock, and went aboard the barge; that the offshore rail and deck were two inches under water; that they were taking coal off the inside forward corner, which would naturally list her off shore; that he looked down the forward hatch, and it seemed as though there were between two and three feet of water in her; that she was down by the stern, and the water was deeper aft; that the siphon was working; that he arranged later to have the coal taken off straight across, and to have it shoveled over from the top, and that as the work progressed she straightened up, but that she seemed to be getting a little deeper in the water all the time; that he noticed no one was working the hand pump on the bow, and that, as he was coming aboard the Arabia, he saw a man standing there, ap-

parently doing nothing; that he asked him if he wanted to work, and he said, "Yes"; that thereupon witness said to him:

"We need some more pumping on the barge. The siphon doesn't seem to be doing as much as is necessary. Go down there and report to the barge foreman. He will put you to work."

Witness further states that the man went down immediately; that the barge foreman showed him the pump, and he went to work pumping; that witness went back to the dock, and tried, through telephone, to get the steamer Hustler to come and siphon the barge out, but was unsuccessful; that he then went back to his office, and when he arrived there was informed that the barge had capsized. Witness further testifies that he thinks the deck was still awash when Pannier went aboard, but that he took no notice as to that, and that the pump where Pannier was put to work was 60 or 70 feet distant from where the deck was under water. When asked respecting his recollection touching the load as to being heavy in the center, he answered that it was about even; that the coal was in heaps; that it was not an evenly spread load, but seemed to be heavier by the stern than elsewhere, and was apparently about the same weight from the stern to midship; from midship it was a little lighter—not much. Further, witness says he did not think there was any danger of the barge going over; otherwise, he would not have put Pannier on, or left their own men on, and that he thought there was a chance, if they could get the coal straightened up and the boat eased up a little at the stern, of the thing coming out all right.

F. S. Gandy, a witness for the respondent Portland & Asiatic Company, who was in charge of the unloading of the barge, testifies more particularly than any other touching the final capsizing of the barge. He says, in effect, that for the last half hour she had been on an even keel, "only just going one way and then the other," the guards being level with the water; that a large steamer went by, and, as the swell struck the barge, she came to the side of the ship, and hung over so far that he shouted to the men to come to the side of the ship; that—

"on the receding swell, as the wave took her, she started the coal. The coal all slid, and then the barge went right with it. She went with it when the coal slid. That is what tipped the barge. The water in the hold is what—the barge turned turtle—made it turn turtle. If she had been an empty barge, she would have come back—righted herself."

Witness further testified that Pannier did not try to come to the side of the ship when he sang out; that the last witness saw of him he had hold of the pump, and that there was no show in the world for him to get out; that the coal went clear of him, but that he sank with the barge.

The witnesses—the O'Reillys, Kelly, Murray, Kane, Gandy, and Smith (who superintended the loading), as well as Doyle, the barge-master—all testify that the barge was properly loaded; and Supple, Murray, Kelly, Gandy, and Seaman concur in saying that, if the boat had been staunch and seaworthy, the taking off of 25 to 30 tons of coal from any quarter would not have had the effect to strain her or to open her seams and butts. Seaman, however, who saw the barge

while loading, from across the river, and just about the time she went over, thinks that she was loaded too heavy in the center, but, being so far away, he was not sure of his impression. Edward Dewyl, a witness who saw the barge from the same viewpoint, testifies that it seemed to him that the barge was loaded too heavily in the center. Gandy thinks that the barge was "hogged" a little bit, which would indicate that she was loaded light in the center.

A little further as to Pannier. Kane says O'Reilly put Pannier to work at the pump, and that he worked, there steadily until the barge went down. He (Pannier) went aboard and around by the starboard side to the forward end, where the pump was located. Doyle testifies that he did not think there was any danger of the barge capsizing at the time, but knew that it was getting in bad condition; that he did not tell Pannier that he was in any special danger; that Pannier knew as much about it as he did; that the men were all talking about the barge; that at one time, when the Hustler came along, he heard the workmen telling the boy (meaning Pannier), "Boy, now you are pumping for your life," but that witness did not know whether they were joking him, or were serious about it. Doyle further testifies that he went up forward as the boat came by, and heard the longshoremen pass the remark: "It is all off now. She is about gone"—and that Pannier was standing there listening; that he was up pretty close to where the men were working, and could have heard it all.

This is a sufficient review of the evidence, although in a cursory way, to give an intelligent idea of the situation, both as it pertains to the seaworthiness of the barge and the manner in which it was handled by the lessee, and as to the employment of Pannier, and the libelant's relative responsibilities in the premises. It seems to be conceded by proctors for libelant that it was incumbent upon libelant to furnish a seaworthy craft, or, rather, that its warranty attending the demise imposed such an obligation. It is insisted, however, that under section 4283, Rev. St. U. S. (U. S. Comp. St. 1901, p. 2943), the unseaworthiness, if it existed at the time of the demise, must have been a thing within the privity or knowledge of the libelant; otherwise, libelant is entitled to a limitation of liability.

Of course, the libelant being a corporation, the requisite privity or knowledge of its corporate and managing officers and agents would be tantamount to privity or knowledge of the corporation itself. The corporation, though said to be soulless, must possess animation and vitality, which is infused always through its authorized officers and agents; and its will, knowledge, persuasion, and policy are only the will, knowledge, persuasion, and policy of such managing officers and agents. There must be responsibility lodged somewhere, and the corporation, in simple justice, must be held to as strict and full accountability as individuals. It not infrequently transpires that a vessel, after entering upon her voyage or engaging in the service for which she is dispatched, becomes unseaworthy, and damage ensues, without any apparent cause from stress of weather or collision in any way, or undue or negligent abuse in handling and navigating her, and in every

such case the presumption obtains that she was unseaworthy at the time of entering upon her service. How else could her condition be accounted for? In the case of The Arctic Bird (D. C.) 109 Fed. 167, the barge, the subject of libel, was taken in tow, having cargo on board, and, having proceeded for six hours on her voyage, sank without receiving injury from any known source, and without encountering strong wind or rough sea. The court held it was to be presumed that the barge was unseaworthy at the outset; otherwise, there was no cause or way to account for her action in failing to perform the functions for which she was dispatched. The court quotes, as authoritative, from Dupont De Nemours v. Vance, 19 How. 162, 15 L. Ed. 584, as follows:

"As to what constitutes seaworthiness, it has been uniformly held that if a vessel springs a leak, and founders, soon after starting upon her voyage, without having encountered any storm or other peril to which the leak can be attributed, the presumption is that she was unseaworthy when she sailed."

And also from Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012:

"If a defect without any apparent cause be developed, it is to be presumed it existed when the service began."

It may be, however, that the unseaworthiness was occasioned or incurred without the privity or knowledge of the owner. It is then that section 4283, Rev. St. (U. S. Comp. St. 1901, p. 2943), comes to the aid of the owner and limits his liability to the value of his craft, so that the liability becomes in effect the liability of the craft only. Such a case was presented by The Annie Faxon, 75 Fed. 312, 21 C. C. A. 366, where the steamer was lost through a defect in her boiler, causing an explosion. A competent person was employed to make an inspection, who failed to discover the defect, and the court declared that privity or knowledge thereof, the defect not being patent, could not be imputed to the managing officers of the corporation, and hence not to the corporation itself, and that, unless the defect was apparent, or of such character as to be detected by an unskilled person, the knowledge thereof could not be so imputed to the corporation. See, also, Quinlan v. Pew, 56 Fed. 111, 5 C. C. A. 438.

Other cases might be cited to the same purpose. I am constrained to the view, however, that the case at bar does not come within the principle there announced. It is rather to be controlled by the authority of The Republic, 61 Fed. 109, 9 C. C. A. 386. No expert or other person was appointed or required by either the manager or superintendent of the lumber company to make a survey of the barge Monarch to determine with respect to her seaworthiness or fitness to undergo the service to which she was appointed under the demise; but these officers depended solely upon their own skill and ability for ascertainment as to her condition. They were thus dependent upon their own diligence, and for their lack of diligence in discovering at least what was or would have been apparent upon inspection to an unskilled person the corporation would be responsible. In the case last cited, after tracing somewhat the history of the limitation act, the court says:

"The English courts have always construed the acts as intending to exempt the shipowner when he himself has not been in any way to blame, and to deny him the limitation of his liability only when personal blame is attributable to him [citing authorities]. Undoubtedly, by our statute, as by the English statutes, the common-law liability of the shipowner is not restricted in cases where his personal neglect has been an inducing cause of the loss. It was the intention of Congress to relieve shipowners from the consequences of all imputable culpability by reason of the acts of their agents or servants, or of third persons. but not to curtail their responsibility for their own willful or negligent acts [citing authorities]. A loss is not occasioned without the knowledge or privity of the shipowner when it arises from his personal neglect to inform himself of the defective condition of his vessel ; the vessel being under his immediate personal supervision."

The effect of the act is stated with conciseness and perspicuity by Mr. Justice Gray, in Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 440, 9 Sup. Ct. 469, 471, 32 L. Ed. 788, as follows:

"That act leaves them [the shipowners] liable without limit for their own negligence, and liable to the extent of the ship and freight for the negligence or misconduct of their master and crew."

The O'Reillys were the manager and superintendent, respectively, of the libelant. They have testified fully as to their knowledge of the condition of the barge at the time of the demise. They show that each of them was in the hold of the barge from time to time, one of them only a short time before she was given into the charge of the Portland & Asiatic Company, and made observations as to her condition. But it is clear that neither of them made any critical or careful examination at any time, with proper lights to aid them in determinng her condition. Neither of them would say with persuasion that the keelson was not broken, as asserted by Seaman, or that the other conditions as portrayed by the latter did not exist. The craft had been long in use, had been twice overhauled, and required the recent protection of a new siphon, with an engine, to keep her hold free of water. It is at least questionable whether the repairs of 1900 were made with good judgment or proper skill, and it is certain that the barge was afterwards subjected to severe usage. Nor does the evidence bear out the contention that the barge was misused in loading and unloading to such an extent as to cause her to leak and finally capsize, if she had been seaworthy at the start. There is, and can be, no suggestion of overloading. The loading was practically carried on under the advice of Doyle, the bargemaster, and one of the O'Reillys, who was at the dock on the morning of the 27th, and it was concluded in a manner that has the approval of a number of men who were versed in the proper way of loading such a craft. The O'Reillys both say she was properly loaded, except one of them seems to think she might have been slightly heavy in the center. Doyle and one of the O'Reillys were directing as to the manner of unloading, so that no blame can attach to the employés of the Portland & Asiatic Company in relation to that service.

Libelant's strong contention is that the cause of the wreck was, first, in loading the barge on the 24th from her bow back to her center with 125 to 130 tons of coal, and permitting her to remain up by the stern

for two days, and in overloading her in the center, which forced her ends up and caused her seams and butts to open, thus causing her to leak abnormally. As to the manner of loading her, Supple, who was an expert in the construction and management of a model barge, was of the firm opinion that it did not hurt her at all, as it was the usual way adopted for loading a barge. Smith, who supervised the loading of the barge, testifies that the load was put on tier by tier until three were aboard, which completed the work, and the first tier was carried back half the distance at the end of the first day; and, as evidence that it did no harm, the bargemaster testifies that no unusual leakage became apparent until the morning of the 28th.

The second contention is likewise untenable. Seaman and Dewyl are evidently mistaken as to the overloading in the middle of the barge. They were not sure of that themselves, and the current of testimony is so strong to the contrary I am led to believe that there was no sufficient inequality in the respect suggested to account for the mishap. Nor could the taking of coal from the barge on the evening of the 27th by the Hassalo and Harvest Queen have affected her vitally, or even materially, if she had been a seaworthy craft. This is the consensus of opinion of several competent witnesses. The case is not dissimilar to that of Forbes v. Merchants' Exp. & Transp. Co. (D. C.) 111 Fed. 796. In that case the barge, with her cargo, sank at the dock during the night after being loaded. The only peril to which she had been subjected was that from the swells caused by passing vessels, and it was held that the presumption arose from such facts that the barge was unseaworthy, and that her sinking was due to that cause, in the absence of evidence establishing some other adequate cause. As applicable here, I quote from the opinion of the court:

"Vessels ordinarily seaworthy withstand the swells of passing vessels, and this barge did not. The inference is that she was not seaworthy. If upon this occasion she was not equal to the strains successfully withstood by other vessels lying at that dock, the inference would be that she had become weakened and was in need of repairs. What other vessels met without injury caused her to sink. The swells were nightly present. Their influence was known. They were the usual, common accompaniments of navigation. The respondent's barge, to be deemed seaworthy, should have been able to withstand them. The Northern Belle, 9 Wall. 526, 19 L. Ed. 748. She was an old boat. She had survived the use for which she had been constructed, and been rehabilitated for purposes of a freight barge, and it was the duty of her owner to give her the attention that vessels of her age and decrepitude require. She had not been thoroughly examined and overhauled since the respondent first repaired her, and her bottom had not been examined for several months before the accident. The presumption is, from her sinking, that she was not seaworthy, and the court is unable to discover sufficient facts overcoming this presumption. Therefore the respondent must be held not to have discharged the burden, which rests upon it, of showing that she was seaworthy against ordinary conditions."

I quote, also, the language of Goff, Circuit Judge, in Donaldson v. J. W. Perry Co., 138 Fed. 643, 644, 71 C. C. A. 93:

"The appellant claims that the barge was improperly unloaded; that a portion of the cargo was removed from one part of the vessel, and thereby she was left on an uneven keel, with the result that a leak was sprung. The cargo was unloaded in the usual way. It is quite evident that the barge was not seaworthy, and that she was not able to withstand the dangers incident to

the voyage she had undertaken. The water causing the damage entered through an opening three inches long in the bottom of the barge. A vessel leaking because of the removal of a portion of its cargo, whereby an uneven keel was caused for a few hours, can hardly be classified as seaworthy."

It is very evident that the immediate cause of the barge overturning was the water in her hold. If she had been rid of that, she would have sustained her load without accident. The testimony does not show any sufficient reason by which to account for her taking in water in such great volume, beginning on the morning of the 28th of December. She had not been subjected to any stress of weather, nor were the swells occasioned by the passing and repassing of other water craft of sufficient force to affect her. The loading, as has been shown, was not of a nature to produce the abnormal leakage, so that it must necessarily be presumed that the barge was unseaworthy when she entered upon her service. Important facts as to her bad condition were brought home to the managers of the lumber company, which, together with their omission to conduct a proper examination of her, renders them negligent of duty, and the company must be held to a privity or knowledge of her unseaworthy condition.

From these considerations, the libelant is not entitled to a limitation of its liability, and must respond to the Portland & Asiatic for the entire value of the coal lost by reason of the barge capsizing.

The next feature of the controversy pertains to the right of recovery by the administrator of his estate for the death of Pannier. It is urged that Pannier assumed the risk of the mishap; that the dangers of his service were open, obvious, and apparent; and that, by accepting and continuing in the service, he took upon himself the burden of liability, thus relieving the libelant of all accountability for his injury. The principle upon which the assumption of risk is maintained is well established, and we need not discuss it further, nor dilate upon it. The rule may be conceded, as announced by Mr. Chief Justice Lord, in Brown v. Oregon Lumber Co., 24 Or. 315, 33 Pac. 557, that:

"In accepting the service, he [the employé] not only assumes the risks reasonably to be anticipated as incident to it, but he also assumes that he has the capacity to understand the nature and extent of such service and has the requisite ability to perform it."

Yet, with these things, there is to be considered the employé's knowledge and appreciation of the dangers he was to encounter. If he had not the knowledge, was not warned nor instructed, and did not understand, or could not, by the exercise of common prudence, have understood or formed a correct and full estimate of the real situation he was to and did encounter, then it could not be said that he assumed the hazard of his employment. If he did appreciate the danger, then the hazard attending the service was his own. Stager v. Troy Laundry Co., 38 Or. 480, 485, 63 Pac. 645, 53 L. R. A. 459. The entire doctrine is comprehensively stated in a very recent case from the Supreme Court of Oregon. Millen v. Pacific Bridge Co. (Or.) 95 Pac. 196, 198. The court says:

"The doctrine of assumption of risk is wholly dependent upon the servant's knowledge, actual or constructive, of the dangers incident to his employment. Where he knows, or in the exercise of reasonable and ordinary care

should know, the risks to which he is exposed, he will as a rule be held to have assumed them; but where he either does not know, or, knowing, does not appreciate, such risks, and his ignorance or nonappreciation is not due to negligence or want of due care on his part, there is no assumption of risk."

This is not a case coming within the principle alluded to in Carlson v. O. S. L. R. Co., 21 Or. 450, 452, 28 Pac. 497. Pannier was not employed to put the barge in repair, or in a safe and suitable condition for use; nor can it be said that as to him he embarked in the service of rescuing the craft from a known and appreciated peril. O'Reilly, seeing Pannier apparently without employment, said to him:

"We need some more pumping on the barge. The siphon doesn't seem to be doing as much as is necessary. Go down there and report to the barge foreman. He will put you to work."

And thus was his employment effected. There was nothing said as to the hazard attending the service, nor was Pannier instructed, or in any way warned, that he was about to encounter any danger whatever. True, when Pannier went aboard, the guard and a portion of the deck were probably awash on the port side of the barge. But Pannier went aboard by way of the starboard or inshore side, and, going around to the bow of the vessel, he took his position at the pump, and continued at his work incessantly until the time of the mishap. From his position, he could not see that the deck was under water, because the coal intercepted his vision, and it is altogether probable that he was never aware that that condition of the barge existed. The testimony of Doyle would seem to indicate that some of the boys from the Hustler, a passing steamer, sang out to Pannier that he was pumping for his life, and that Pannier was within hearing of the longshoremen when they were remarking as to the situation: "It is all off now. She is about gone"—and using other like expressions. But it is a fair deduction from the testimony that the boys from the Hustler were joking with Pannier, and that Pannier did not hear the conversation between the longshoremen. It is absolute that he was taking no part in such conversation, and, being at work faithfully at his post of duty, it is improbable that he heard any considerable part of it. Pannier was a carpenter and joiner by trade, and there was no testimony offered showing his acquaintance with the duties and the hazards incident to the occupation of a mariner or longshoreman in service on shipboard. It is altogether improbable that he had any adequate appreciation of the risk he was incurring by going and remaining aboard of the barge to assist in pumping the water from her hold. Even O'Reilly, Gandy, and Doyle did not seem to think the barge was in imminent danger until within a short time previous to her capsizing; and certainly neither O'Reilly nor Doyle instructed or warned Pannier of his danger. I am strongly impressed that Pannier neither understood nor appreciated the risk that he was incurring when he went aboard for duty, nor during the time of his service, unless it might have been immediately before the barge capsized. He was still pumping when the mishap occurred, and failed to make any attempt to come to the side of the ship when Gandy shouted to the men. Possibly he did not hear the warning. The libelant was negligent in its duty to Pannier, in that it did

not give Pannier the proper instruction or warning as to the danger he was incurring to himself, and, Pannier not having appreciated such danger and hazard, libelant is liable to his estate for the damage it has sustained by reason of his death.

The amount of coal lost by the respondent Portland & Asiatic Steamship Company was 441 tons, and its value $4.33¾ per ton, aggregating $1,912.84. To this should be added loss of the iron tubs and coal chutes, value $175. The libelant, therefore, is liable to the respondent Portland & Asiatic in the sum of $2,087.84, to which should be added legal interest from the date of the mishap causing the loss.

The respondent Strauhal, as administrator, is entitled to recover the amount of the present value of Pannier's estate, taking into account his expectancy of life, and the probable accumulations during that period. He was a little over 31 years of age, and his expectancy of life about 34 years. He was healthy and vigorous, sober and industrious, and it is related that in the last two years of his life he saved as his earnings $500, which he paid over to his sister, under some arrangement that they had between them for possible future care of himself by his sister. Outside of this, it is shown that Pannier, shortly previous to his last employment, was earning $3 per day. But, without following the testimony further, here is sufficient to show that his probable net earning capacity was $250 per year. According to the Northampton Tables, the present sum that will produce an annuity of $250 during his expectancy of life, invested at the rate of 4 per cent. per annum, is $3,660. Such is the basis of deduction adopted in The D. S. Gregory and The George Washington, Fed. Cas. No. 4,100, and I am impressed that it is fair and equitable. The sole question under the Oregon statute is, what has the estate lost by the death of the decedent? And this rule measures the amount of the administrator's recovery. The respondent Strauhal is therefore entitled to recover from the libelant the sum of $3,660, to which should be added interest at the legal rate from the time of the death of Pannier.

The respondent Oregon Railroad & Navigation Company has incurred no liability whatever, and the cause should be dismissed as to it.